# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| TOMIKA REED, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case No. 15 C 3368 |
| ) | |
| COLORADO TECHNICAL UNIV., ) | |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Tomika Reed has sued her former employer, Colorado Technical University (CTU), for claims arising from the termination of her employment. She asserts claims under the False Claims Act (FCA), 31 U.S.C. § 3730(h); the Illinois Whistleblower Act (IWA), 740 ILCS 174/30; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5(f); the Americans with Disabilities Act (ADA), 42 U.S.C. §12117(a); the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2617(a); and for intentional infliction of emotional distress under Illinois law. CTU has moved to dismiss Reed's claims under the False Claims Act, the Illinois Whistleblower Act, and for intentional infliction of emotional distress for failure to state a claim.

## Facts

The Court takes the following factual allegations from Reed's amended complaint. Reed began working for CTU in November 2009, as an admissions advisor. In this position, Reed recruited potential students by telephone and assisted students on

how to apply for financial aid through the FAFSA website.  Reed alleges that she was a top-performing admission advisor and received the employee of the month award several times.

On or about July 31, 2013, Freeda Psihogios, one of Reed's managers, observed Reed's telephone call with a prospective student and met with her afterwards to discuss why she did not enroll the student.   Reed stated that she refused to enroll the individual because he said he only wanted the financial aid.  Reed told Psihogios that enrolling the student would violate Department of Education (DOE) regulations.  Reed added that the prospective student actually could have been a DOE investigator testing CTU for legal compliance.  Reed informed Psihogios that when Kaplan University admissions officers enrolled ineligible students, they all lost their jobs when the DOE investigators caught them making such enrollments.   Psihogios disagreed with Reed, and during their one-hour meeting, she yelled at Reed, Reed cried, and co-workers overhead what took place.  Reed's direct manager, Greg Monn, was brought into the meeting and wrote Reed up with a final warning.

Around the same time, Reed became pregnant, and it turned out to be a high-risk pregnancy.  Some months earlier, Reed's fiancé, who was a co-worker, filed an EEOC charge against CTU.  Reed alleges that Psihogios took every opportunity to humiliate and harass her, including talking loudly and negatively about her, criticizing her appearance, and starting rumors about her.  Reed also alleges that Monn and Psihogios excluded her from team meetings and social gatherings, denied her system privileges, took her off managerial level work, and frequently reprimanded her on inconsequential matters.  Reed contends that she went to human resources and the

company's ethics hotline to request a transfer, but her request was denied, and Monn told her that she "made this mess, now [she] had to live with it." Am. Compl. ¶ 26.

In late August 2013, Reed alleges, Monn met with her and her fiancé. He told them "need to stop making trouble." *Id.* ¶ 27. He also told Reed to stay out of the EEOC investigation her fiancé's complaint had triggered, reminding her that she "had a baby coming soon" and should not be playing "Russian Roulette with [her] job." *Id.*

In or around October 2013, Reed says that Monn told her about an opening at American Intercontinental University (AIU), an affiliated entity to CTU. Monn said he would remove the warning in Reed's file so she would be eligible to transfer. Reed applied for and was offered the AIU position, but she says the offer was put on hold after the final warning turned up in her file despite Monn's representation. When Reed confronted Monn about this, she says, he told her she no longer "deserve[d] the move," owing to the "inconveniency of [her] pregnancy," her fiancé's complaint, and her accusations of wrongdoing against Psihogios. *Id.* ¶ 32. Reed says that Monn also said CTU no longer "want[ed] to be inconvenienced by an upcoming maternity leave," *id.* ¶ 33, and he urged her to resign. Reed went to Monn's boss, Kathryn Baretto, to discuss the situation. She says that Baretto said nothing other than that the final warning would remain in Reed's file.

Reed alleges that Monn's harassment got worse after she was denied the transfer. Reed alleges that in anticipation of her transfer, all of her prospective students had been taken away in anticipation of her promotion, but none were assigned back; her computer was frequently inoperative, and she was given excessive and unattainable enrollment goals. Reed was then put on a performance improvement plan. When she

3

asked Monn about the enrollment goals she had been given, she alleges, Monn replied, "If you have so many issues with the company, and your health, why not resign?" *Id.* ¶ 41.

Reed alleges that Monn also continued to give her a hard time about going to doctor's appointments. She describes in her complaint a particular occasion when she says Monn refused to allow her to leave the building for a medical emergency. While Reed was sitting at her desk, a co-worker came by and asked if she was okay, pointing at her lap. Reed says her pants were "soaked with blood." *Id.* ¶ 45. She asked Monn for permission to go to the hospital because she was bleeding. Despite the emergency, Reed says, Monn made her wait two hours before giving her permission to leave work.

Reed alleges that the harsh treatment continued after this. She took bereavement leave after her father passed away in March 2014. Reed says that during the few days she took off, co-workers called her and reported that management was saying she had lied about her father dying.

On April 28, 2014, Reed gave birth to her son and began her maternity leave. She claims that CTU representatives checked her LinkedIn profile page and asked her co-workers to check social media to determine whether she actually had a baby. She alleges that in the summer of 2014, she suffered a depressive episode due to the combined effect of post-partum depression and emotional distress from her treatment at work.

## Discussion

In deciding a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6), a court accepts all well-pleaded facts in the plaintiff's as true

and views them in the light most favorable to the plaintiff. *Doe v. Vill. of Arlington Heights*, 782 F.3d 911, 915 (7th Cir. 2015). Allegations that amount to "no more than conclusions," however, are not entitled to the same assumption of truth. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). "To determine whether a plaintiff has adequately stated a claim for relief, a court must assess whether the complaint's well-pleaded factual allegations "plausibly give rise to an entitlement of relief." *Id.*

Reed has asserted seven claims. Count 1 of her amended complaint is a claim of unlawful retaliation under the FCA. Count 2 is a claim of unlawful retaliation under the IWA. Count 3 is a claim of discrimination on the basis of pregnancy under Title VII. Count 4 is a claim of discrimination on the basis of disability in violation of the ADA. Count V is a claim of retaliation under Title VII. Count 6 is a claim of retaliation under the FMLA. Count 7 is a state-law tort claim alleging intentional infliction of emotional distress. CTU has moved to dismiss Counts 1, 2, and 7.

**1.     FCA retaliation claim (Count 1)**

Under the FCA, an employee is entitled to relief if she was discharged, harassed, or otherwise retaliated against "because of lawful acts done by the employee . . . in furtherance of an action under [the FCA] or other efforts to stop 1 or more violations" of the statute. 31 U.S.C. § 3730(h)(1) (emphasis added). To state a retaliation claim under the FCA, a plaintiff must allege that she engaged in protected activity; the employer had knowledge of the plaintiff's activity; and the discharge (or other adverse action) was motivated, at least in part, by the protected activity. *Brandon v. Anesthesia & Pain Mgt. Assocs., Ltd.*, 277 F.3d 936, 944 (7th Cir. 2002); *see also, McGinnis v. OSF Healthcare Sys.*, No. 11-CV-1392, 2014 WL 378644, at *8 (C.D. Ill. Feb. 3, 2014).

5

"Courts analyze the conduct the plaintiff engaged in and his purpose for doing so to help determine whether these elements have been sufficiently pled." *McGinnis*, 2014 WL 378644, at *8.

A plaintiff engages in protected activity when she acts in furtherance of an action under the FCA or when she engages in other efforts to stop a violation of the FCA. 31 U.S.C. § 3730(h)(1). An "action" under section 3730(h)(1) includes situations when a *qui tam* lawsuit is a distinct possibility or where litigation could be filed legitimately. *Brandon,* 277 F.3d at 944. This term of the statute covers "conduct that put[s] an employer on notice of potential [FCA] litigation." *Halasa v. ITT Educ. Servs., Inc.*, 690 F.3d 844, 847 (7th Cir. 2012) (internal quotation marks omitted).

Reed does not appear to contend that she engaged in activity in furtherance of an "action" (as defined above) under the FCA. Rather, she essentially says that she declined to participate in a violation, explained why, and suffered retaliation for this and for making her views known to management. In 2009, Congress amended section 3730(h)(1) to expand the definition of protected activity to include "other efforts to stop" violations of the FCA, not just acts taken in furtherance of an actual or possible FCA lawsuit. *See Halasa*, 690 F.3d at 847. The new language includes "reporting suspected misconduct to internal supervisors." *Id.* at 847-48. This language does not appear to be limited to reports of suspected misconduct; any "effort to stop" an FCA violation would appear to suffice. And it does not appear that an effort to stop, as the statute uses that term, requires a lawsuit under the FCA to be in the offing.

The real question here is whether Reed's allegations are sufficient to describe an "effort to stop" an FCA violation. Reed alleges that she declined to participate in the

enrollment of an applicant whose comments suggested that he wanted to enroll only to get financial aid. Reed says she believed that enrolling the applicant would have violated "DOE laws," but she does not identify what laws, regulations, or rules she means, either in her complaint or in her response to the motion to dismiss. In addition, the question under section 3730(h)(1) is not whether she made an effort to stop a violation of some federal law; rather it is whether she made an effort to stop *a violation of the False Claims Act*. Reed does not allege in her complaint, nor does she argue in her response to the motion to dismiss, that any violation of the FCA was occurring or about to occur, let alone how. In its current form, Count 1 does not state a claim for retaliation under the FCA.

## 2.     IWA retaliation claim (Count 2)

The IWA states that "[a]n employer may not retaliate against an employee for refusing to participate in an activity that would result in a violation of a State or federal law, rule, or regulation." 740 ILCS 174/20. To state a claim for retaliation under the IWA, the plaintiff has to plausibly allege that "(1) [she] refused to participate in an activity that would result in a violation of a state or federal law, rule, or regulation and (2) [her] employer retaliated against [her] because of that refusal." *Sardiga v. N. Trust Co.*, 409 Ill. App. 3d 56, 656-57, 948 N.E.2d 652, 656-57 (2011). The plaintiff must allege "that refusal to participate in an illegal activity caused her employer to retaliate against her." *Nelson v. Levy Home Ent., LLC*, No. 10 C 3954, 2012 WL 403974, at *8 (N.D. Ill. Feb. 8, 2013); *see Robinson v. Stanley*, No. 06 C 5158, 2011 WL 3876903, at *5-7 (N.D. Ill. Aug. 31, 2011), *aff'd,* 474 F. App'x 456 (7th Cir. 2012).

Reed's retaliation claim arises from the incident where she says Psihogios

7

rebuked her for failing to enroll a prospective student who allegedly said that all he was interested in was getting the financial aid money. When Psihogios confronted Reed, she said that she had refused to enroll the student because doing so would have violated "DOE (Department of Education) laws." It is certainly conceivable that enrolling this student would have violated a federal statute or regulation, but Reed does not identify one, either in her complaint or in her response to the motion to dismiss. The Court does not intend to do Reed's work for her and therefore dismisses Count 2. If Reed seeks leave to amend this claim, she should, in her complaint, provide more information regarding the nature of the violation in which she allegedly declined to participate.

3. **IIED claim (Count 7)**

   a. **Preemption by IWCA**

CTU argues that the Illinois Worker's Compensation Act (IWCA) preempts Reed's common law claim for intentional infliction of emotional distress. Under the IWCA, "[n]o common law or statutory right to recover damages from the employer . . . for injury or death sustained by any employee while engaged in the line of his duty as such employee, other than the compensation herein provided, is available to any employee who is covered by the provisions of this Act . . . ." 820 ILCS 305/5(a).

One way to avoid preemption of a common law tort claim is to show that the injury was not accidental. *Meerbrey v. Marshall Field and Co.*, 139 Ill. 2d 455, 463, 564 N.E.2d 1222, 1226 (1990). More specifically, a workplace injury "which the employer or its alter ego intentionally inflicts upon an employee or which were commanded or expressly authorized by the employer" is not considered "accidental" and thus is not

preempted by the IWCA. *Id.* Participation by management in the infliction of the injury, or failure to discharge an employee after learning of the employee's intentional tort against a plaintiff, are considered sufficient authorization to avoid preemption. *See, e.g., Flood v. Washington Sq. Restaurant, Inc.*, No. 12 C 5729, 2012 WL 5996345, at *6 (N.D. Ill. Nov. 30, 2012).

Psihogios, who was directly involved in the alleged retaliation, was one of Reed's managers. Monn, who is also claimed to have participated in the retaliation, was also a manager of Reed, and Baretto, who allegedly did nothing when the retaliation was reported to her, was above Monn in the CTU hierarchy. Psihogios evidently had the authority to tell Reed which students to enroll. Monn was more than just a supervisor; he evidently had the authority over whether Reed could transfer to a sister company. And Baretto ranked higher up than Monn. Their alleged direct involvement in the alleged wrongdoing is sufficient to give rise to a plausible claim that CTU authorized an intentional tort committed against Reed. This is sufficient to avoid dismissal based on IWCA preemption.

    **b.    Preemption by IHRA**

The Illinois Human Rights Act (IHRA) provides that "[e]xcept as otherwise provided by law, no court of this state shall have jurisdiction over the subject of an alleged civil rights violation other than as set forth in this Act." 775 ILCS 5/8–111(c). Under this provision, the IHRA preempts an intentional infliction of emotional distress (IIED) claim when the claim is "inextricably linked to a civil rights violation such that there is no independent basis for the action apart from the [IHRA] itself." *Maksimovic v. Tsogalis,* 177 Ill. 2d 511, 517, 687 N.E.2d 21, 23 (1997). The issue is whether the legal

duty that the defendant is claimed to have breached has a source in Illinois law other than the IHRA; if the conduct would be actionable even aside from its character as a civil rights violation, there is no preemption. *See, e.g., Naeem v. McKesson Drug Co.*, 444 F.3d 593, 604 (7th Cir. 2006).

To prevail on an IIED claim, a plaintiff must establish that "(1) the defendant's conduct was extreme and outrageous, (2) the defendant intended to inflict severe emotional distress or knew that there was at least a high probability that his conduct would inflict severe emotional distress, and (3) the defendant's conduct did cause severe emotional distress." *Id.* at 605 (internal quotation marks omitted)). Factors considered in determining whether conduct is extreme and outrageous include the degree of power or authority the defendant had over the plaintiff; whether the defendant reasonably believed the objective it was pursuing was reasonable; and "whether the plaintiff is particularly susceptible to emotional distress because of some physical or mental condition or peculiarity." *Honaker v. Smith*, 256 F.3d 477, 490-92 (7th Cir. 2001).

The cases reflect some reluctance to allow IIED claims arising from employer-employee conflicts, *see id.* at 491, the concern being that doing so would authorize IIED claims by most workers who are terminated or even disciplined. *See, e.g., Schroeder v. RGIS, Inc.*, 2013 IL App (1st) 122483992, ¶ 27, 992 N.E.2d 509, 518 (2013). But there is no absolute ban on IIED claims in the employment context; as the Seventh Circuit has stated, actionable extreme and outrageous conduct may be considered to have occurred "where the employer clearly abuses the power it holds over an employee in a manner far more severe than the typical disagreements or job-related stress caused by

10

the average work environment." *Honaker*, 256 F.3d at 491; *see Naeem*, 444 F.3d at 604 (permitting an IIED claim arising from an employment relationship).

A good deal of what Reed alleges, though completely inappropriate if proven true, does not differentiate her case from the type of employment dispute that likely does not give rise to a viable IIED claim. Specifically, Reed's allegation that defendant humiliated and harassed her by talking loudly and negatively about her, criticizing her appearance, starting rumors, excluding her from team meetings and social gatherings, denying her system privileges, taking her off the managerial level, frequently reprimanding her for "little things," giving her excessive performance goals, and pressuring her to resign might not be enough to sustain an IIED claim. This case, however, involves an unusual element, specifically Monn's alleged refusal to allow Reed to seek medical attention connected with her pregnancy (which Monn allegedly knew about), and in particular the incident where he made her stay at her desk, with bloody clothing, for two hours after she asked permission to go to a hospital. The Seventh Circuit's discussion of IIED in *Honaker* makes it clear that taking advantage of an employee's known physical or psychological vulnerabilities is a significant factor that may tip the balance, *see Honaker*, 256 F.3d at 492, and Monn's alleged action also may be claimed to have put the health of Reed or her unborn child at risk, another significant factor. *See Briggs v. N. Shore Sanitary Dist.*, 914 F. Supp. 245, 252 (N.D. Ill. 1996).

The Court concludes that Reed has adequately alleged a plausible IIED claim that is based on breach of a duty other than duties imposed solely by virtue of the IHRA. CTU is not entitled to dismissal of this claim.

**Conclusion**

For the foregoing reasons, the Court dismisses Counts 1 and 2 of plaintiff's amended complaint for failure to state a claim but declines to dismiss Count 7.

Date: March 15, 2017

_____
MATTHEW F. KENNELLY
United States District Judge